The Law Offices of Barbara B. Comerford, P.A.
45 Eisenhower Drive, Suite 280
Paramus, New Jersey 07652
Telephone: 201-485-8806
Fax: 201-485-7014
**Attorneys for Plaintiff Herman Serrano**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| HERMAN SERRANO,<br><br>Plaintiff,<br><br>vs.<br><br>LIFE INSURANCE COMPANY OF NORTH AMERICA,<br><br>Defendant | Civil Action No.<br><br>COMPLAINT |

Plaintiff, Herman Serrano (hereinafter "Plaintiff" or "Mr. Serrano"), by way of Complaint against the Defendant, alleges as follows:

**JURISDICTION**

1. Plaintiff resides at 342 Washington Road, Sayreville, New Jersey 08872.

2. Defendant Life Insurance Company of North America d/b/a CIGNA Group Insurance (hereinafter "Defendant" or "LINA") is an insurance company organized and existing under the laws of the Commonwealth of Pennsylvania, with a principal place of business being 1601 Chestnut Street, Philadelphia, PA, 19192, and is authorized to do business in the State of New Jersey.

3. Immediately prior to his disability, Mr. Serrano was employed by Blackboard, Inc.

4. By virtue of his employment with Blackboard, Inc., Mr. Serrano was eligible to participate in Group Policy number LK-0963835 ("the Policy" or "the Plan") (Exhibit A), issued by Defendant to Blackboard, Inc..

5. The LTD Policy is a group policy underwritten by Defendant. Under the terms of the LTD Policy, the policyholder is Blackboard, Inc. Blackboard, Inc. has designated Defendant as the claims fiduciary to evaluate claims, determine eligibility, and pay benefits pursuant to the Plan.

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) in that the claims herein arise under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132 et. seq.

7. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) and (c) in that the Plaintiff resides in New Jersey.

**ESSENTIAL FACTS**

8. Mr. Serrano is a 60-year-old man with a background in and degree in Computer Programming. For most of his career, he worked in an educational environment providing technological learning support and instruction.

9. Mr. Serrano suffers from herniated and bulging discs of the lumbar spine; degenerative disc disease; lumbar radiculopathy; osteoarthritis of both knees; hip pain; diabetes mellitus; diabetic retinopathy; peripheral neuropathy; hypertension; and supraventricular tachycardia.

10. As a result of his medical conditions, Mr. Serrano suffers from severe back and knee pain; upper and lower extremity neurological dysfunction; fatigue; and difficulty standing, walking, bending, crouching, squatting, lifting, and carrying. As a result of these conditions and symptoms, Mr. Serrano's activities of daily living have been dramatically adversely impacted.

11.     Mr. Serrano has been totally disabled under the terms of the Policy as a result of his physical conditions and symptoms since January 1, 2017.

12.     From June 2005 until his date of disability, Mr. Serrano worked as a Senior Consultant/Trainer at Blackboard, Inc., an educational technology company. As a Senior Consultant/Trainer, Mr. Serrano traveled to client sites to facilitate, establish, and grow their online learning presence and use of Blackboard products. He specifically taught deans, administrators, directors, managers, faculty, and instructors, how to use Blackboard's products and online services. He was responsible for serving as the point person in providing comprehensive educational consulting services including strategic planning, support, online curriculum developmental design, and creating learning materials. He was required to travel extensively domestically and internationally.

13.     The Policy defines "Disability" as follows:

*The Employee is considered Disabled if, solely because of Injury or Sickness, he or she is:*

1. *Unable to perform the material duties of his or her Regular Occupation; and*
2. *Unable to earn 80% or more of his or her Indexed Earnings from working in his or her Regular Occupation.*

*After Disability Benefits have been payable for 24 months, the Employee is considered Disabled if, solely due to injury or Sickness, he or she is:*

1. *Unable to perform the material duties of any occupation for which he or she is, or may reasonably become, qualified based on education, training or experience; and*
2. *Unable to earn 60% or more of his or her Indexed Earnings.* (Emphasis added)

14.     Mr. Serrano received two MRIs of the knee on August 19, 2016. The MRI of the Left knee showed "moderate osteoarthritis involving the lateral femoral trochlea; mild patellofemoral maltracking; blunting at the apex of the body of lateral meniscus; and medial chondromalacia without subarticular edema. Collateral ligaments showed popliteus tendinopathy. MRI of the Right knee showed, a large complex tear in the posterior horn of the

3

Case 3:20-cv-07689-MAS-ZNQ   Document 1   Filed 06/23/20   Page 4 of 20 PageID: 4

medial meniscus; joint effusion with moderate posterior medial popliteal cyst; and minimal patellofemoral osteoarthritis.

15. On September 8, 2016, Mr. Serrano presented for treatment with Board Certified Orthopedic Surgeon Diego Herrera, M.D. regarding right knee pain. On physical examination, Dr. Herrera noted elbow hyperextension, knee hyperextension with hypermobile patella, and tenderness to palpation over the medial and lateral joint line in the right knee. He had some varicose veins in the medial aspect of the knee and the foreleg. He was assessed as having right knee pain with complex tear of the posterior horn of the medial meniscus. Dr. Herrera recommended that he receive right knee arthroscopy with partial meniscectomy and debridement yet cautioned that that this could fix only the pain coming from the meniscus but not from the arthritis.

16. On November 23, 2016, Mr. Serrano underwent a right knee arthroscopy with Dr. Herrera. Dr. Herrera performed a partial and lateral meniscectomy, and extensive synovectomy.

17. Mr. Serrano suffers from chronic Supraventricular Tachycardia. During pre-clearance evaluation for his arthroscopic knee surgery, Mr. Serrano was noted to have a thickened aortic valve; mitral regurgitation; thickened mitral valve; and tricuspid regurgitation.

18. On or about January 1, 2017, Mr. Serrano ceased working applied for disability benefits.

19. LINA approved Mr. Serrano's claim for Long Term Disability benefits as of April 1, 2017. LINA approved Mr. Serrano's claim based upon a peer review performed by Occupational Medicine specialist Gregory Smith, M.D. Based upon Dr. Smith's review, LINA concluded that Mr. Serrano was physically disabled under the terms of the Policy. As a result,

LINA has enjoyed the financial benefit of offsetting Mr. Serrano's LTD benefits for the time that it paid him by the amount of his monthly Social Security Disability Income benefit.

20. On April 21, 2017, Mr. Serrano visited his primary care physician, Board Certified family practitioner Arthur Miller, M.D. Dr. Miller noted repeated episodes of moderate left knee pain. Pain was a 9 out of a scale from 1 to 10. His symptoms were made worse by knee motion, weight bearing, walking, running, kneeling, and squatting. He had associated symptoms of swelling, warmth, stiffness, locking, instability, and difficulty bearing weight.

21. Mr. Serrano also suffered from severe back pain. In May 2017, Mr. Serrano visited Dr. Herrera who noted lower back pain with right lower extremity radiculopathy including paid travelling down into the right lower extremity and the right thigh itself. Dr. Herrera treated Mr. Serrano for continued knee pain with an Orthovisc injection in both knees.

22. Mr. Serrano underwent an MRI of the Lumbar Spine on May 30, 2017, which revealed foraminal stenosis at multiple levels from L3-S1; subarticular stenosis at L2-L3; disc herniation with facet arthrosis at L5-S1; and disc bulge at L4-L5.

23. Mr. Serrano applied for Social Security Disability benefits. Mr. Serrano was awarded disability benefits by the Social Security Administration ("SSA") upon initial application based upon his inability to engage in any substantial gainful activity.

24. Mr. Serrano continued to treat with Dr. Herrera and to receive Orhtovisc injections in both knees. Due to his ongoing severe and debilitating pain, Dr. Herrera referred Mr. Serrano to a pain management specialist through the Veteran's Administration ("VA").

25. Mr. Serrano underwent a repeat MRI of the left knee on June 25, 2017, which revealed "horizontal tear through the posterior horn of the medial meniscus; the anterior horn appears intact. There is bone bruising of the subjacent medial tibial plateau. There is mild chondromalacia of the medial femoral condyle. Articular cartilage of the lateral femorotibial and

patellofemoral joints appear intact. There is a small medial plica. There is moderate joint effusion present with popliteal cyst measuring approximately 5 x 2.5 x 1.5 cm. There is chondromalacia and subchondral edema noted of the lateral trochlea. The medial and lateral collateral ligaments appear intact. Quadriceps and Patella tendon appear intact. Impression: Tear of the medial meniscal posterior horn. Chondromalacia of the medial femoral condyle and lateral femoral trochlea. Joint effusion. Popliteal cyst."

26. On July 26, 2017, Mr. Serrano underwent a left knee arthroscopic repair.

27. Mr. Serrano initiated pain management treatment through the VA on or about July 20, 2017.

28. On July 31, 2017, evaluation at the VA noted lower back pain that began in the middle of the spine and radiated bilaterally into the lower extremities including the hips, buttocks, lateral thigs, ankles, and the 5th and 1st digits of the toes; and difficulty with standing, walking, prolonged sitting, walking on an incline, using stairs, twisting, bending forwarding, and lifting. Physical examination revealed tenderness on palpation of the lumbar spine, mid-spine and paraspinals; restricted flexion and extension of less than 5% as limited by pain; positive Stump test bilaterally; positive oblique extension; positive Phalen's test; and positive straight leg raise. He was given topical menthol salicylate cream for relief.

29. Despite his knee surgery, Mr. Serrano continued to suffer with severe and disabled bilateral knee and lower back pain with radiculopathy through 2017 and into 2018.

30. At all relevant times, Mr. Serrano has been documented to suffer from significant hypertension.

31. At all relevant times, Mr. Serrano has been documented to suffer from diabetes. Mr. Serrano has struggled to control his diabetes, and his doctors have noted that his diabetes is poorly controlled.

32. Mr. Serrano obtained physical therapy at the VA in an attempt to manage his disabling pain. His physical therapist continuously and objectively documented impairments and abnormalities of the back and lower extremities including buckling; locking; movie goer's sign; swelling; warmth to touch; antalgic gait; difficulty with tiptoe and heel walking due to pain; decreased sensation; reduced range of motion; tenderness to palpation; positive Thomas test, patellar grind test, and McMurray's test; and positive bilateral slump test, oblique extension, and straight leg raise.

33. Mr. Serrano continued with pain management and physical therapy. He was treated with medications to manage his pain including Decadron, Tramadol, Baclofen, Toradol, and Meloxicam. He was prescribed a TENS unit. Despite continued treatment, his severe pain and other symptoms were intractable, and he remained totally disabled.

34. As of January 2018, Mr. Serrano's physicians documented severe, disabling, and objectively correlated neck and upper extremity pain.

35. On January 12, 2018, Mr. Serrano reported for pain management at the VA and reported neck pain that started in the middle of the spine, increased bilateral upper extremity weakness, tenderness, and pain, right greater than left. He reported pain is specifically noted in the inner arms and stop at the inner mid arms bilaterally. He had intermittent trigger finger in the bilateral thumbs. He had some numbness and tingling. He reported his neck is extremely stiff, and that it was difficult to rotate his neck to either side due to the pain. He had increased difficulty with turning doorknobs. When his thumbs locked, he had to pry them open manually.

36. On physical examination of the cervical spinal region, he had restriction with flexion and extension, and both were limited by pain. He had noted tender points to palpation at C3-4, C4-5, C5-6, C6-7, midspine, and bilateral paraspinals.

37. On January 30, 2018, Mr. Serrano underwent an MRI of the cervical spine, which revealed retropulsion of the C7 vertebral body obscuring the anterior subarachnoid space at C6-C7 and C7-T; spinal canal and bilateral neural foraminal stenosis at C4-C5; and loss of height at the C6 and C7 vertebral bodies.

38. On February 20, 2018, Mr. Serrano presented to the VA Emergency Room for treatment. He reported falling over the past few months and having difficulty ambulating on uneven ground with frequent falls, with the last being 4 days prior. He noted falling onto wet grass with the gradual increase of bilateral knee and elbow pain. He had noted chronic pain to these areas but now with 9 level pain. He noted pain to the left knee with radiation to thigh as new. He had a steady gait with use of cane assistance but was limited to walking 300 feet with the assistance of a walker. He was prescribed and provided with a walker to assist ambulation, as well as pain medications.

39. Mr. Serrano underwent a repeat MRI of the lumbar spine on February 21, 2018, which revealed severe bilateral neural foraminal stenosis due to lateral herniation of the disc at L5-S1; broad based disc bulge at L2-L3 with facet degeneration; and disc bulging with facet arthropathy and foraminal stenosis at L4-L5.

40. Mr. Serrano continued to treat with pain management and physical therapy and to use a walker to assist with ambulation. However, his disabling pain and other impairments remained.

41. In or about December 2018, LINA began evaluating Mr. Serrano's claim for transition from the "own occupation" to the "any occupation" definition of disability.

42. On February 4, 2019, Mr. Serrano was examined by Dr. Miller. Dr. Miller noted bilateral knee pain described as sharp and radiating to the lower legs bilaterally. The pain in his knee was rated as a 9 on a scale from 1 to 10. His knee symptoms were noted to be worsened by

knee motion, weight bearing, walking, running, kneeling, and squatting. He had swelling, warmth, stiffness, decreased range of motion, locking, instability, difficulty bearing weight, and difficulty ambulating. He had lower back pain with stiffness, and decreased range of motion. The back pain radiated into his left buttock, left posterior thigh, left lower leg, left foot, right buttock, right posterior thigh, right lower leg, and right foot. His pain was severe and worsening. It was exacerbated by weight bearing, back motion, standing, sitting, prolonged standing, prolonged sitting, lifting, bending, straining, and supine position. It had associated symptoms of leg numbness, foot numbness, leg weakness, foot weakness, and local swelling.

43. Dr. Miller performed a physical examination, which objectively revealed antalgic gait bilaterally. Palpation showed bilateral knee, L1, L2, L3, and L4 tenderness. Flexion and extension was restricted in lower back and painful. Left lateral flexion was restricted and was painful. Right lateral flexion as restricted and painful. Rotation to the left was restricted and painful. Rotation to the right was restricted and painful. He was noted to use a rollator for ambulation.

44. On February 4, 2019, Dr. Miller filled out a Physical Ability Assessment for Mr. Serrano. He noted his assessment was based on his patient's report, observation, examination, and functional assessment. In this assessment, he noted that the claimant would be limited to only occasional standing, sitting, walking, reaching over head, reaching desk level, reaching below the desk, and occasional firm grasp with his hands. He would be able to occasionally lift 11-20lbs. He would be unable to carry, push, pull, or climb. He would be limited to frequent fine manipulation and simple grasp. He noted that Mr. Serrano gets pain when performing these maneuvers. He noted that Mr. Serrano has chronic back pain from old fracture L1-L3, chronic bilateral knee derangement and osteoarthritis, and poorly controlled diabetes.

45. LINA requested Mr. Serrano's updated medical records on or about January 31, 2019. On February 8, 2019, a note to Mr. Serrano's file stated that all records had been received. On March 5, 109, the status of the medical records requested was changed to state that no records had been received.

46. On March 20, 2019, after what LINA now documented was its unsuccessful request for medical records, LINA requested that Mr. Serrano be scheduled for an Insurance Medical Evaluation ("IME").

47. On April 11, 2019, Mr. Serrano reported to the VA for pain management follow-up. Mr. Serrano reported that his pain had been worsening, and was currently a 7-9/10, on a scale of 1-10. He was significantly limited in ambulation and could not sweep, mop, or throw out trash. He had complaints of bilateral knee pain, hip pain, and lower back pain. He had noted numbness and tingling. He had palpitations when lying flat.

48. On physical examination, Mr. Serrano had antalgic gait and ambulated with a rollator walker. He would sway to either side while walking. He had tenderness to palpation over L4-5, L5-S1. He had restricted range of motion in flexion greater than extension, pain limited. He had decreased strength throughout the lower limbs bilaterally. He had decreased sensation in the right lateral calves and right foot. He had tenderness at both knees bilaterally.

49. On April 13, 2019, Mr. Serrano was admitted into Robert Wood Johnson University Hospital due to chest pain and palpitations. He was assessed for acute chest pain and Supraventricular Tachycardia. He had intermittent tightness in his chest. He noted palpitations were worse when he is laying on his side. He had intermittent heart rates of 150bpm. Mr. Serrano was discharged from the hospital on April 15, 2019.

50. On May 13, 2019, Mr. Serrano began treatment with Board Certified Neurosurgeon Kevin Yao, M.D. Dr. Yao noted severe low back pain with radiation into the hips

and both legs. The pain radiated through the left leg into the toes bilaterally. The pain had worsened despite many sessions of physical therapy. Mr. Serrano rated his pain as a 10/10. He described numbness in the legs after 15 minutes of standing. He had difficulty sitting, walking, and carrying objects. He spent most of his day in bed due to pain. He had required increasing assistance such that he now used a wheeled walker to ambulate. On physical examination, he had bilateral pain with Strayer straight leg raise. Gait and station were very antalgic despite the use of a walker. Dr. Yao recommended physical therapy, pain management, and lumbar fusion surgery.

51. On May 16, 2019, Mr. Serrano presented for treatment with Dr. Herrera due to bilateral knee pain. He was treated for bilateral chondromalacia. He was given a prescription for Supartz injections for his knees.

52. On or about June 3, 2019, LINA documented that it had received Mr. Serrano's medical records.

53. Despite receiving Mr. Serrano's medical records, LINA still insisted on proceeding with the IME.

54. At LINA's request, Mr. Serrano underwent an IME with occupational medicine specialist Jeffrey Liva, M.D. on June 4, 2019.

55. Dr. Liva noted that Mr. Serrano had bilateral hip and knee pain and worsening lower back pain. He noted that Mr. Serrano's pain levels were severe. He noted Mr. Serrano's complaints of radiating pain in the lower extremities; tingling sensation in the feet; difficulty sitting, standing, walking, and lifting; weakness; stiff neck; chest pain; and backache. Mr. Serrano noted that his lower back feels stiff and is painful when moving and also when lying down. He noted difficulty opening glass jars.

56. Upon physical examination, Dr. Liva noted that Mr. Serrano used a walker and a cane. He noted that Mr. Serrano appeared uncomfortable. Dr. Liva objectively noted tenderness

over the lumbar spine; restricted cervical range of motion; and decreased sensation in the right lower extremity.

57. Despite the substantial medical evidence of record including that objectively documented on his own examination, Dr. Liva concluded without a reasonable medical foundation that Mr. Serrano could constantly sit, reach in all directions, and perform fine manipulation and grasping. Dr. Liva did not provide a meaningful or substantial justification for reaching these conclusions.

58. Dr. Liva's conclusions are arbitrary, capricious, and unreasonable and are against the weight of the substantial objective medical evidence of record.

59. Dr. Liva's report noted "The opinions expressed do not constitute recommendation that specific claims or administrative action should be made or enforced. All conclusion sin this report are solely the opinions of the author."

60. Following Dr. Liva's evaluation, LINA's internal nurse reviewers claimed to have received Dr. Liva's report and that they agreed with his conclusions. However, they did not provide any meaningful or substantial analysis of Dr. Liva's report or the reasons for their opinion. As such, the nurse reviewers' conclusions were not based upon a full and fair review of Mr. Serrano's claim.

61. LINA requested a copy of Mr. Serrano's SSA file, which LINA received on or about July 9, 2019.

62. Utilizing Dr. Liva's report, LINA referred Mr. Serrano's file for a vocational transferrable skills analysis.

63. On June 11, 2019, LINA's internal vocational analyst Nicole Surmacy issued a report that improperly concluded that Mr. Serrano could perform the occupations of Consultant and Systems Programmer.

64. Ms. Surmacy's opinion failed to account for Mr. Serrano's actual restrictions and limitations and how they prevent him from performing the specific duties of a Consultant or Systems Programmer.

65. Based upon the flawed and often bald conclusions of its paid and employed reviewers, LINA terminated Mr. Serrano's LTD benefits effective August 31, 2019.

66. Despite LINA's unlawful termination of Mr. Serrano's LTD benefits, Mr. Serrano has remained totally disabled under the terms of the Plan.

67. On June 7, 2019, Mr. Serrano received an electrophysiological ablation due to recurrent symptomatic Supraventricular Tachycardia. He had noted symptoms of recurrent palpitations and shortness of breath. He had inducible typical slow-fast AV nodal reentrant tachycardia. He had an ablation of slow pathway for atrioventricular nodal reentry and 3-Dimensional mapping.

68. On December 4, 2019, Mr. Serrano presented for treatment with Dr. Miller due to back and knee pain. He noted falling down three times in the past three weeks and that he was experiencing increase in knee pain due to falling. He noted that these falls were due to poor balance from back and sciatic pain bilaterally. He was experiencing numbness in his arms along with urinary and fecal incontinence. He noted numbness in the legs upon standing, impaired balance, leg weakness, impaired mobility, and impaired ability to live independently. Mr. Serrano rated his pain as a 7 or 8 on a scale of 1-10.

69. On physical examination. Dr. Miller noted antalgic gait with the use of a rollator; limited range of motion in all planes of the right shoulder; limited range of motion of the right hip upon flexion, extension, bilateral flexion, and rotation with pain. Dr. Miller assessed lumbar spine arthritis, sprain of the right knee, bruised rib, sprain of the right shoulder, and neurologic gait disorder.

70. Mr. Serrano additionally reported that after falling he had been experiencing amnesia and blurred vision along with headache, vertigo, nausea, and neck pain. In additional to his other diagnoses, Dr. Miller assessed post-concussion syndrome.

71. Mr. Serrano initiated physical therapy with Lauren Bush, D.P.T. on May 2, 2019. Upon initial assessment, Dr. Bush noted that Mr. Serrano was at 3% of maximum functionality. On physical examination, range of motion in the right knee was 105 degrees for flexion and 0 degrees for extension. Left knee range of motion was 80 degrees on flexion and 0 degrees on extension. He had moderate bilateral tenderness on palpation of the quadriceps femoris, paraspinals, quadratus lumborum, piriformis, biceps femoris, and popliteus. Lumbar spine range of motion was 5 degrees on flexion, 0 degrees on extension. Bilateral side bending was 5 degrees. Gait demonstrated short stride length, decreased floor clearance, decreased heel off and strike, and slow gait speed. He used a standing cane but usually has a walker. He had significant difficulty carrying, driving, lifting, prolonged sitting, prolonged standing, sleeping, stairs, and walking. Mrs. Bush assessed him as having significant pain in the lumbar spine and bilateral knees. He had gait and balance deficits, decreased range of motion, decreased strength, and muscle spasm. He was unable to perform household chores and negotiate through the community.

72. Mr. Serrano continued treating with Dr. Bush, who continued to note his disabling pain and impairments despite ongoing treatment.

73. On or about June 21, 2019, Mr. Serrano initiated treatment with pain management specialist Weal Elkohy, M.D., who is Board Certified in Anesthesiology. Upon physical examination, Dr. Elkohy noted reduced cervical range of motion; tenderness to palpation over the cervical facets bilaterally; upper trapezius muscle spasm bilaterally; cervical paraspinal muscle spasm bilaterally; restricted range of motion of the lumbar spine; tenderness over the

midline and over the lumbar facets bilaterally; lumbar paraspinal muscle spasm bilaterally; straight raise positive at 30 degrees bilaterally; and motor strength reduced in the right upper extremities bilaterally and the lower extremities bilaterally. Dr. Elkohy recommended a lumbar epidural injection and an EMG/NCS to evaluate for radiculopathy.

74. Mr. Serrano continued treating with Dr. Elkohy, who continued to note his disabling pain and impairments despite ongoing treatment, including severe pain; difficulty with prolonged sitting, standing, or being; difficulty sleeping due to pain; and difficulty functioning on a daily basis.

75. On September 30, 2019, Mr. Serrano underwent an EG/NCS, which objectively confirmed right L-5 and S1 radiculopathy and sensorimotor demyelinating peripheral neuropathy of the bilateral lower extremities.

76. On February 18, 2020, Mr. Serrano filed, via counsel, a plenary appeal of LINA's termination of his LTD benefits. The appeal included Mr. Serrano's updated medical records.

77. Mr. Serrano's February 2020 LTD appeal also included a report from Dr. Miller, his longtime treating primary care provider. Dr. Miller wrote, "Physically, he walks with a rollator and has very limited range of motion of his back. He is in chronic pain from both new and old injuries, some of which he suffered in the service when skydiving and his parachute did not open properly. This injury to his back has been a chronic problem for him. His most recent hgA1C was 8.3 and he is a type 2 insulin dependent diabetic."

78. Dr. Miller opined, "I do not feel that Mr. Serrano will be able to be gainfully employed in the future. He has too many orthopedic conditions that limit his mobility…He suffers from chronic pain…There is no question that his medical condition disables him from working at this time nor in the foreseeable future."

79. Despite the substantial medical evidence of record, LINA upheld its unlawful termination of Mr. Serrano's LTD benefits via letter dated March 26, 2020. LINA's decision to uphold its denial relied upon the opinion of a peer reviewer who disregarded the substantial medical evidence of record to conclude that Mr. Serrano had full-time physical work capacity including standing up to three hours per day, walking up to three hours per day, and constant sitting for up to eight hours per day. This peer reviewer's conclusions are against the weight of the substantial medical evidence of record which documents a litany of objective radiologic and exam findings documenting Mr. Serrano's disability from working in any occupation.

80. LINA's March 26, 2020 denial letter noted Mr. Serrano's SSA disability award but failed to provide a meaningful or sufficient reason for reaching a different conclusion that that of the SSA.

81. Prior to filing the initial plenary appeal on February 18, 2020, counsel for Mr. Serrano wrote to LINA and noted that the contractual limitations period on Mr. Serrano's LTD claim was due to expire on April 1, 2020. Given the proximity of the deadline on Mr. Serrano's LTD appeal to the contractual limitations deadline, counsel requested that LINA toll the contractual limitations period in this matter in order to allow Mr. Serrano a full and fair opportunity to appeal and review LINA's adverse benefit determination.

82. LINA agreed to toll the contractual limitations period until 90 days following a denial of the appeal that counsel filed on February 18, 2020.

83. The Policy provides Plaintiff with opportunity to file a second level of appeal following the denial of the first level of appeal.

84. After reviewing LINA's March 26, 2020, denial, Plaintiff decided to file a second level of appeal.

85. After receiving the denial of Mr. Serrano's first level of appeal on March 26, 2020, counsel for Plaintiff again wrote to LINA and requested that LINA toll the contractual limitations period until after receipt of a denial on Plaintiff's second level of appeal.

86. Rather than grant Plaintiff's request, LINA told Plaintiff to request the tolling period when submitting the second level of appeal.

87. As LINA is aware, its response is untenable because the contractual limitations period in this matter expires prior to the deadline for Mr. Serrano's second level of LTD appeal.

88. Consequently, Plaintiff brings this lawsuit in order to toll the applicable limitations period with respect to his LTD claim, while he pursues a second level of appeal of LINA's adverse benefit deteramintaion.

89. Mr. Serrano has availed himself of his administrative remedies under the Policy and so brings this lawsuit pursuant to ERISA, 29 U.S.C. §1132 (a)(1)(B).

## AND FOR A FIRST CAUSE OF ACTION

90. Mr. Serrano repeats and re-alleges each and every allegation set forth above at paragraphs 1-89 as if fully set forth herein again.

91. Mr. Serrano is and has been continuously disabled within the meaning of the terms of Group Disability Policy No. LK-0963835. As such, he is entitled to benefits under the Plan.

92. At all times relevant herein, LINA has failed to follow reasonable claims procedure as required by ERISA 503, 29 U.S.C. § 1133 and the accompanying regulations in that LINA has denied Mr. Serrano's benefits despite his total disability due to his physical conditions; disregarded Mr. Serrano' objective and subjective evidence of disability; disregarded the findings and conclusions of his treating medical providers without a meaningful explanation for doing so; improperly discounted the disabling effect of Mr. Serrano's pain in contravention

17

of the law; misrepresented the substantial medical evidence of record; failed to adequately explain how Mr. Serrano can perform the duties of any occupation; failed to properly consider the determination of the Social Security Administration; and selectively reviewed the evidence in an attempt to justify a denial of Mr. Serrano's claim.

93. Mr. Serrano has availed himself of his administrative remedies as required by the applicable Plan.

94. By virtue of the foregoing, LINA has breached the terms of the LTD Plan under which the Plaintiff, Herman Serrano, is a beneficiary and has violated the requirements of the Employee Retirement Income Security Act, 29 USC § § 1001 *et seq.,* 1132 and 1133 and the applicable regulations promulgated thereunder in a manner that is arbitrary and capricious and wrong.

95. In light of the foregoing, Plaintiff brings this lawsuit pursuant to ERISA, 29 U.S.C. §1132 (a)(1)(B).

**WHEREFORE**, Plaintiff requests that this Honorable Court enter judgment against LINA and enter an Order as follows:

1. Declaring Mr. Serrano disabled within the meaning of the LTD Plan.
2. Ordering Defendant to immediately place Mr. Serrano on claim under the LTD Policy and pay all retroactive benefits owed to date as well as benefits on an ongoing basis.
3. Awarding Plaintiff his costs of suit, including reasonable attorney's fees.
4. Awarding to Plaintiff interest on all unpaid benefits and waiving any and all premium charges accruing with respect to said policies of insurance.
5. Granting such further relief as this Court may deem just and proper.

## AND FOR A SECOND CAUSE OF ACTION

96. Mr. Serrano repeats and re-alleges each and every allegation set forth above at paragraphs 1-95 as if fully set forth herein again.

97. In 2013, LINA entered into a Multi-State Regulatory Agreement (hereinafter "the Agreement," (Exhibit B) with the states of Maine, Ohio, Pennsylvania and California after investigations by these states revealed regular improper claim handling by LINA with regard to insureds who resided in those states.

98. New Jersey subsequently signed the Agreement and became a participant thereto.

99. Plaintiff is a resident of New Jersey.

100. Per the Agreement, LINA stipulated that it would improve and reform its procedures to bring LINA's practices in line with proper claim handling protocol and the standards of the National Association of Insurance Commissioners.

101. LINA's conduct with respect to Mr. Serrano's claim violates provisions of the Agreement, including the Agreement's stipulation that LINA will improve its procedures for evaluating medical information including claimant's reported symptoms and medical findings, and documenting conclusions; and LINA's agreement that it will reform its procedures regarding claimants' Social Security Disability benefit awards.

102. By violating the Agreement, LINA has breached the contractual duties it owes to Mr. Serrano thereunder.

103. By violating the Agreement, LINA has engaged in arbitrary and capricious conduct in violation of ERISA, 29. U.S.C. §§1001 *et seq.,* 1132 and 1133.

**WHEREFORE**, Plaintiff requests that this Honorable Court enter judgment against LINA and enter an Order as follows:

1. Declaring Mr. Serrano disabled within the meaning of the LTD Plan.

2. Ordering Defendant to immediately place Mr. Serrano on claim under the LTD Policy and pay all retroactive benefits owed to date as well as benefits on an ongoing basis.

3. Awarding Plaintiff his costs of suit, including reasonable attorney's fees.

4. Awarding to Plaintiff interest on all unpaid benefits and waiving any and all premium charges accruing with respect to said policies of insurance.

5. Granting such further relief as this Court may deem just and proper.

## DESIGNATION OF TRIAL COUNSEL

Plaintiff designates Sara Kaplan-Khodorovsky, Esq. as trial counsel.

## CERTIFICATION

I certify that the matter in controversy is not the subject of any other action or arbitration proceeding, now or contemplated, and that no other parties should be joined in this action.

Dated:  June 23, 2020         By:  _____
                                    Sara Kaplan-Khodorovsky
                                    The Law Office of Barbara B. Comerford
                                    45 Eisenhower Drive, Suite 280
                                    Paramus, New Jersey 07652
                                    Telephone: 201-485-8806
                                    Fax: 201-485-7014
                                    Attorneys for Plaintiff Herman Serrano